**Kelly S. GRANT, Plaintiff,**

v.

**SOCIAL SECURITY ADMIN., Kenneth S. Apfel, Acting Commissioner, Defendant.**

**No. 4:97CV3251.**

United States District Court, D. Nebraska.

Sept. 11, 1998.

---

James D. Leach, Viken, Viken Law Firm, Rapid City, SD, for Plaintiff.

Susan L. Knight, Assistant United States Attorney, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This is a social security case in which Kelly S. Grant ("Grant"), an intelligent and hard-working former rancher, appeals the Commissioner's refusal to award him ongoing Social Security disability benefits. Grant, who everyone believes is credible, suffered various cerebral vascular accidents ("CVAs"), otherwise known as strokes, when he was in his early forties. Grant suffered severe medical problems and later organic depression.

The Administrative Law Judge ("ALJ") awarded Grant benefits for about a year. However, the ALJ refused to award Grant ongoing benefits. Because the ALJ failed to adequately explain why he disregarded the opinions of various medical professionals regarding the severity and duration of Grant's depression and because the ALJ ignored depression entirely when asking the vocational expert hypothetical questions, I will reverse and remand for a further hearing.

### I. Background

I will state the procedural history of this case and the ALJ's findings. I will then describe the pertinent facts.

### A. Procedural History

Grant filed an application for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr. 109–111.) The claim was denied initially (Tr. 133, 142–145) and on reconsideration (Tr. 154–155, 165–167). On October 12, 1995, following a hearing before the ALJ, the ALJ concluded that Grant was disabled from June 15, 1993, to June 29, 1994, but not thereafter. (Tr. 16–31.) On June 6, 1997, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. (Tr. 6–8.) The decision of the ALJ stands as the final decision of the Commissioner. Since the Plaintiff filed this action within the time provided by 42 U.S.C. § 405(g), this court has jurisdiction to review the ALJ's decision.

### B. The ALJ'S Findings

The ALJ found that: (1) Grant had not engaged in "any substantial gainful activity after June 15, 1993" (Tr.29); (2) Grant had "severe impairments" which included "multiple cerebellar infarcts; and depression" (Id.); (3) Grant's impairments did not meet or equal in severity the listing of impairments (Id.); (4) Grant could not return to his past relevant work (Id.); (5) Grant was disabled from June 15, 1993, until June 29, 1994, because he could not even do sedentary work, but after that date Grant improved and regained the residual functional capacity to do light and sedentary work including jobs as a house sitter, cafeteria attendant and school bus monitor. (Id. at 30.)

### C. Facts

#### June 1993–July 1994/The Strokes

In June of 1993, Grant had surgery to remove a mass from his sinuses. The mass was removed, but subsequently, Grant began to suffer extremely severe headaches. On the afternoon of June 17, 1993, Vickie A. Grant, Grant's wife, noticed that Grant was becoming incoherent and so she took him to the doctor. The family practitioner, Joel F. Hutchins, immediately referred Grant to Dr. Terry Mark Himes, a neurologist.

Dr. Himes ordered an MRI. (Tr. 315.) The MRI revealed multiple scarring, indicative of strokes. (Id.) Dr. Himes conducted further studies on July 16, 1993, and August 2, 1993. As a result of these studies, Himes concluded that "two of the four major vessels to the brain [had clotted off for no known reason]." (Tr. 316.)

Because Grant was still suffering from the results of his stroke in September of 1993, he was referred to the Mayo Clinic. Grant was primarily seen at the Mayo Clinic by Alison M. Emslie–Smith, M.D., Ph.D., of the Department of Neurology. (Tr. 297.) Angiography demonstrated that "both distal vertebral arteries" suffered "dissection and occlusion." (Tr. 297.) Essentially, the Mayo Clinic confirmed what Dr. Himes had found. (Tr. 222–223.)

No one was able to determine what caused the strokes. The Mayo Clinic suggested that because "Mr. Grant is a very active farmer

and does a lot of heavy lifting, ... this may have been responsible for the problem." (Tr. 223.) Because nothing further could be done for Grant, he was placed "on aspirin therapy" and told to "pay closer attention to other risk factors for stroke." (Tr. 316.) Grant also "was informed at that time that he should avoid ranching type work due to the stresses and strains that might [be] place[d] on his neck." (*Id.*)

From the inception of the strokes to his evaluation at the Mayo Clinic in the fall of 1993, Grant suffered from severe headaches, severe vertigo with head tremor, a disturbance of speech and language ("dysarthria"), decreased concentration and severe nausea and vomiting associated with change in position, driving or motion. (Tr. 297.) He also suffered from difficulties with depth perception and double vision ("diplopia"). (*Id.*)

By the summer of 1994, Grant was still suffering from "persistent difficulty with depth perception and extremely easy motion sickness and vertigo, particularly on driving but also with other sudden movements." (Tr.297). Grant found these symptoms "particularly disabling." (*Id.*) In addition, Grant had "very subtle speech and language problems which are most prominent under stress." (*Id.*)

Accordingly, Grant again consulted Dr. Emslie–Smith at the Mayo Clinic in July of 1994. By this time, Grant had given up ranching "because of the residual neurological difficulties which were disabling him and also because of the concerns of his medical advice that heavy lifting and neck movements might again predispose him to a [stroke]." (*Id.*)

The July, 1994, consultation with Dr. Emslie–Smith revealed through doppler examination that there had been increased narrowing of the vessels. (Tr. 298.) However, because it was not believed that Grant had suffered further strokes, the risk of further invasive examination was felt to be outweighed by the benefits that might be derived from that examination. Accordingly, Grant was continued with aspirin and anti-hypertensive (blood pressure lowering) medications. (*Id.*)

On July 6, 1994, Dr. Emslie–Smith wrote Grant's family physician, Dr. Hutchins. She described Grant as a "delightful man" who was experiencing a good recovery from very significant strokes. She thought that the residual effects of the stroke were likely to be "relatively mild, and he should respond well to further rehabilitation." (Tr. 225.) She thought his "prognosis from his event is excellent." (*Id.*) Dr. Emslie–Smith stated that she did "not feel that his disabilities or risk factors are sufficient to preclude gainful employment in the future." (*Id.*)

### After July of 1994/The Depression

Despite the fact that in July of 1994 Dr. Emslie–Smith was hopeful that Grant would be able to seek gainful employment, Grant was still having problems. For example, on January 23, 1995, he returned to his family physician to obtain a refill on his prescriptions. At that time, Grant was having problems with his vision, slowness of speech and balance. (Tr. 295–296.)

In two letters dated January 11, 1995, and again on February 28, 1995, Dr. Emslie–Smith revised her estimate of Grant's prognosis. It is unclear what prompted Dr. Emslie–Smith to change her mind, but it is clear that she did not examine Grant again in 1995.

In a letter dated January 11, 1995, Dr. Emslie–Smith opined that Grant's "speech and language difficulties may be some handicap to him in the interview situation[,]" that Grant "would be very likely to benefit from any retraining opportunities[,]" and that Grant was "a very pleasant and well motivated individual who is very determined to return to full employment if this is possible." (Tr. 293.)

In a February 28, 1995, letter, Dr. Emslie–Smith stated that in July of 1994, Grant's main problems were "persistent difficulty with depth perception and extremely easy motion sickness and vertigo, particularly on driving but also with other sudden movements. He has found this particularly disabling. He has very subtle speech and language problems which are more prominent under stress." (Tr. 297.) Dr. Emslie–Smith once again stated that Grant was a "motivated individual" who was "extremely keen to return to gainful employment." (Tr. 298)

Importantly, she also stated that Grant's symptoms remained "disabling and at this length of time, the chances of improvement are unpredictable." (*Id.*)

Grant saw Dr. Himes again on April 13, 1995. (Tr. 303–304.) At this time, Grant was complaining of poor memory and concentration, poor self confidence, difficulty speaking in stressful situations and depression. (*Id.*) Dr. Himes conducted a neurological examination of Grant. He further reviewed Dr. Emslie–Smith's letter of February 28, 1995. He also interviewed Vickie Grant.

In a letter to the family physician, Dr. Hutchins, Dr. Himes stated that Grant complained of "suffering fairly significantly from depression" and that Grant's wife confirmed these complaints. (Tr. 303.) According to the patient and his wife, Grant "has a number of subtle personality changes and cognitive problems" and his "self confidence has been poor since the cerebral vascular accidents." (*Id.*) For example, Grant "has increasing problems with talking when he is in stressful situations" and he has "difficulties with concentration." (*Id.*)

Dr. Himes informed Dr. Hutchins that "[m]y impression is that he does have a major depression" and "I also believe he has fairly significant neuro-cognitive deficits as a result of a cerebral vascular accident." (*Id.*) According to Himes, he believed that "these would have a very significant impact on his pursuit of vocational rehabilitation" and that Grant's symptoms "are certainly complicating his recovery." (*Id.*) Specifically, Grant's "current ongoing problems with memory and concentration deficits as well as depression are certainly impeding his ability to seek and find employment." (Tr. 304.) Accordingly, Dr. Himes recommended "neuropsychometric testing." (*Id.*) In the interim, Dr. Himes informed Dr. Hutchins that Dr. Himes had placed Grant on Prozac and requested that Grant return in six to eight weeks. (*Id.*)

Pursuant to Dr. Himes' suggestion for neuropsychological testing, Grant consulted Allen D. Brandon, Ph.D., Clinical Director of the Rocky Mountain Neuropsychological Sciences group in Fort Collins, Colorado. This consultation lasted two days and was very extensive. (Tr. 308–13.)

Dr. Brandon first required that Grant consult with William R. Kammerer, M.D., a psychiatrist. (Tr. 312.) The psychiatric consultation revealed to Dr. Brandon that Grant was suffering "underlying depression, anxiety and organic mood disorder, as well as cognitive changes secondary to CVA [the strokes]." (*Id.*)

Dr. Brandon also administered numerous neuropsychological tests. Based upon these tests and the psychiatric consultation, on June 1, 1995, Dr. Brandon wrote that Grant was suffering from a "[n]europsychological disorder secondary to CVA of 6–13–93, including difficulties with complex memory, verbal fluency, complex concentration, complex executive functioning." (Tr. 313.) Brandon believed that Grant also suffered from "[o]rganic mood disorder with depression, agitation, mood swings, and anhedonia [absence of pleasure], flattening of affect and decreased motivation." (*Id.*) In addition, Brandon diagnosed Grant as suffering from situational depression. (*Id.*)

For treatment purposes, Dr. Brandon referred Grant to Drs. Himes and Hutchins for medications to help with the depression. (*Id.*) Dr. Brandon also recommended vocational rehabilitation, occupational therapy and ongoing speech therapy. (*Id.*) Dr. Brandon stated that: "Mr. Grant will have great difficulty returning to prior work area, and vocational rehabilitation is critical." (*Id.*)

Importantly, Dr. Brandon stressed that: "Certainly, the patient should apply for disability status through Social Security Disability Determination Service (SSDI), given the ongoing medical disability from a neuropsychological, neurological points of view." (Tr. 312.) While Grant demonstrated "a number of strengths[,]" [1] he was "still showing slight improvement" and "given that he is now approximating two years post-CVA, speed of recovery at this time may be expected to be slower." (Tr. 313.) This was particularly true because "[o]rganic mood disorder is also noted, with flattening of affect, and continued

---

1. For example, Grant scored in the superior range on the I.Q. tests. (Tr. 310.)

psychopharmacologic care [medication] is indicated." (*Id.*)

Subsequently, and on August 7, 1995, Dr. Brandon opined that Grant was not "in a position of returning to any type of work at this time." (Tr. 338.) Dr. Brandon believed that jobs such as "housekeeping [and] school monitoring" would "lead to greater organic mood disorder, with depression and flattening of ego strength/self-esteem." (*Id.*) Brandon recommended, in contrast, that Grant participate in full vocational rehabilitation as opposed to menial work. (*Id.*)

On June 22, 1995, after receiving the June 1, 1995, report of Dr. Brandon, Dr. Himes referred Grant to Dr. James H. Sorrell, a psychiatrist. (Tr. 314.) On August 15, 1995, Dr. Sorrell prepared a report. (Tr. 339.) He indicated that he had examined Grant. Dr. Sorrell recounted that: "Mr. Grant sustained a stroke two years ago. He has been on Prozac for three months now and generally feels somewhat better; however, he continues to have anxiety, difficulty with concentration as well as easily crying and poor sleep. Mr. Grant has noticed a significant decrease in his energy since he has had this stroke as well as a significant decrease in his motivation." (*Id.*)

Dr. Sorrell felt that "his going back to work would not be appropriate." (*Id.*) In addition, Dr. Sorrell opined that jobs, such as a cafeteria attendant, housekeeper, or school monitor, would not be appropriate for Grant because of his difficulty with concentration and anxiety. Indeed, Dr. Sorrell felt that "in any of these situations he would have an exacerbation of his anxiety, possibly resulting in a panic attack." (*Id.*)

In a letter dated July 5, 1995, Dr. Himes summarized his opinion regarding Grant. Based upon Himes' medical records, his treatment of Grant, his familiarity with Grant's treatment at the Mayo Clinic and his review of Dr. Brandon's assessment, Himes opined "with a reasonable degree of medical certainty" that Grant was totally disabled as a result of the cerebral vascular accident from mid-June of 1993 onward, and that the disability would likely "continue into the future for a minimum of the next one year." (Tr. 317.) The disability in part was related to "a organic depression" flowing from "very significant neuropsychological deficits" that were caused by the strokes. (*Id.*)

Dr. Himes did not believe that Grant could do his past work as a rancher and Dr. Himes believed "he was disabled to the extent that he was not capable of pursuing any other type of gainful activity." (*Id.*) Dr. Himes concluded by stating that Grant had "on going [sic] neuropsychological deficits[,]" a "psychological reaction to his stroke[,]" continuing "intermittent motion sickness and vertigo" and continuing "subtle speech and language problems." (Tr. 317–318.) Accordingly, Dr. Himes stated that "while he is making progress, it is not reasonable to expect that he is going to be able to·find substantial gainful employment for at least another twelve months." (Tr. 318.) [2]

### Grant's Work History After the Strokes

Aside from doing some sporadic farm work for neighbors (Tr.324), and going out to his father-in-law's ranch, which was "actually more of a chance to get away or get out to the farm again" (Tr. 57), Grant did not do any work until May 15, 1995. (Tr. 55–58; Ex. 54.) Starting in May of 1995, Grant worked three days a week for eight hours a day cutting grass on a tractor for the City of Gordon. (Tr. 22.) He was paid the minimum wage. Grant would service the mower and sharpen the blades for about an hour and then would spend the rest of his day mowing and periodically getting off the tractor to move trash. (*Id.*)

Grant's wife, who was trained as a school psychologist, stated that Grant had tried and failed at full-time work mowing for the city. (Tr. 329.) Even with part-time work Grant was having physical difficulty performing the work. (Tr. 329–30.) The part-time work also was exacerbating Grant's "motion sick-

---

**2.** Dr. Himes briefly examined Grant again on July 31, 1995. (Tr. 335.) Dr. Himes noted a slightly improved energy level with an increase in Grant's dosage of Prozac. (*Id.*) Dr. Himes noted that Grant was able to work on a part-time basis, mowing lawns up to about three days per week, "but this is very physically demanding for him." (*Id.*) Dr. Himes thought Grant was making slow but definite progress at that time. (*Id.*)

ness" problems. (Tr. 330 .) According to his wife, Grant was only able to perform the part-time work because the City of Gordon "has been very good in accommodating Kelly's special needs (e.g., doctors appointments, shorter work weeks, having other[s'] help available if things need moved)." (Tr. 330.) Although Grant enjoyed his work for the city (Tr. 334), he nevertheless continued to show signs of depression, according to his wife. (Tr. 328–29; 331–32.) These signs included "insomnia; psychomotor retardation; fatigue or loss of energy; diminished ability to think or concentrate and indecisiveness; and feelings of worthlessness." (Tr. 328.)

### The ALJ's Depression Analysis

Although it is difficult to ascertain exactly how the ALJ treated the issue of depression, he apparently made two findings. One dealt with the duration of the depression and the other the severity.

With respect to Grant's complaints of depression, the ALJ found that Grant had first complained of depression to Dr. Himes in April, 1995. After reviewing the testimony of Drs. Himes, Brandon and Sorrell and the plaintiff's wife, who was trained as a school psychologist, the ALJ concluded that Grant's depression was "not shown by the medical evidence to have lasted 12 continuous months and I find no reasonable basis to conclude from the medical evidence of record that, with treatment, it will last the requisite period of time." (Tr. 25.)

Moreover, the ALJ also found Dr. Brandon's neuropsychological evaluation "to be the most persuasive as to claimant's mental impairments and limitations and to be consistent with claimant's daily and work activities." (Tr. 24.) According to the ALJ, Dr. Brandon's evaluation showed "no indication that claimant would be unable to perform noncomplex routine and repetitive tasks. This capacity for routine and repetitive tasks is consistent with claimant's current employment cutting grass." (*Id.*)

### The ALJ's Hypothetical Questions to the Vocational Expert

The ALJ put three hypothetical questions to the vocational expert that fairly described Grant's physical and intellectual impairments flowing from the strokes. (Tr. 94–98; 104–06). The expert found that with these limitations, Grant could find only light work in three jobs; that is, Grant could work as a house sitter, a cafeteria attendant or a school crossing guard. (Tr. 96.)

However, none of the ALJ's questions dealt with the issue of depression. For example, the hypothetical questions did not ask whether a claimant who suffered from the residual physical and intellectual effects of serious strokes *and* who suffered clinical anxiety, agitation, and mood swings (all factors identified by Dr. Brandon) could find and perform substantial gainful activity in the national economy.[3]

### II. Discussion

I will reverse and remand this case for further administrative proceedings. The ALJ failed to adequately explain why he discounted the opinions of various medical professionals that Grant suffered from serious depression and that such depression was likely to last more than 12 months. Thus, the ALJ failed to include any mention of depression in the hypothetical questions addressed to the vocational expert at step–5 of the sequential analysis. Given the other findings by the ALJ, the government bore the burden of proof at step–5 to prove that Grant could perform substantial gainful activity. Since the government attempted to meet the burden through the vocational expert's testimony and absent an appropriate basis for discounting the opinions of the medical professionals on the question of depression, the failure to recognize depression in the hypothetical questions constituted reversible error.

A more detailed statement of reasons for this decision is set forth below. I first state what I understand the law to be, and then I apply the law to the facts.

3. When asked to assume, among other things, that Grant should "only occasionally interact with the public" (Tr. 97–98), the expert stated that Grant could not perform two of the three jobs. (Tr. 98.) The expert did not comment on how such a limitation would impact Grant's ability to perform the third job.

## A. Law

### Standard of Review

■ As to the scope of review, when jurisdiction is vested under 42 U.S.C. § 405(g) as it is here, and the question raised in this court is factual in nature, this court employs the "substantial evidence on the record as a whole" standard. *See, e.g., Hogg v. Shalala,* 45 F.3d 276, 278 (8th Cir.1995) (substantial evidence on the record as a whole failed to support the ALJ's finding that SSI claimant was not disabled). If, on the other hand, jurisdiction is vested under section 405(g) and the question raised is legal in nature, this court reviews the legal question de novo. *See, e.g., Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994) (failure to apply proper legal standard is sufficient grounds for reversal of a benefits determination independent of substantial evidence analysis). *See also* Carolyn A. Kubitschek, *Social Security Disability* § 8:3, at 492 (1994) (the substantial evidence standard "is not the standard of review for legal questions, which the courts review de novo.")

### Part–Time Work

In order to be considered disabled, a claimant must not be able to perform "substantial gainful activity." 20 C.F.R. § 404.1571 (1998) ("If you are able to engage in substantial gainful activity, we will find that you are not disabled.") By the time of the August, 1995, hearing, Grant had started working part-time for the City of Gordon mowing lawns. He began this work in May of 1995. He was paid at a rate of $5.15 per hour. He worked three days a week for about eight hours a day, and the city made special accommodations to assist him. Throughout this period of time, his doctors and his wife (a trained school psychologist) testified that Grant was suffering from serious depression.

■ The general rule is that the claimant must be able to perform the work "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc). Simply put, Grant's part-time work mowing lawns does not necessarily prove Grant's ability to work "day in and day out" in the "real world." *See, e.g., Titus v. Callahan,* 133 F.3d 561, 565 (8th Cir.1997) ("The ALJ's reasons for rejecting the expert's testimony [that claimant could not work in a competitive environment] are not persuasive. The record indicates that her past jobs were menial and part time...").[4]

### Durational Requirement of Disability

■ In order for a disability to be considered as a basis for awarding benefits, the law requires that one of three alternative durational requirements be satisfied. First, if the disability "can be expected to result in death," the durational requirement is satisfied. 20 C.F.R. § 404.1505(a) (1998); 20 C.F.R. § 404.1509 (1998). Second, if the disability "has lasted ... for a continuous period of not less than 12 months," the durational period is satisfied. 20 C.F.R. § 404.1505(a). Finally, if the disability "can be expected to last for a continuous period of not less than 12 months," then the durational period is also satisfied. *Id.*

Thus, even though the first mention of Grant's depression occurred in April of 1995, the ALJ was not permitted to ignore his depressive condition if that condition was expected to last a year or more. In other words, the ALJ's task was to look at both the past and the future. The ALJ was obligated to look at the historical impact of the strokes and the future impact of the depression. Only by finding that the depression had not lasted 12 continuous months in the past and was not likely to last 12 continuous months in

---

4. The ALJ was permitted to consider Grant's part-time work in deciding whether Grant could perform "substantial gainful activity." 20 C.F.R. § 404.1572 (1998) ("Your work may be substantial even if it is done on a part-time basis...."). However, because Grant's yearly average earnings from mid–1993 through the date of the hearing were far below the annual threshold of

$500 per month, the ALJ could not automatically deny benefits because Grant had this part-time job. 20 C.F.R. § 404.1574(b)(2)(vii) (1998) ("We will consider that your earnings from your work activities as an employee show that you have engaged in substantial gainful activity if ... [y]our earnings averaged more than $500 a month in calendar years after 1989.")

the future could the ALJ ignore depression because of the duration of the illness.

**Step–5 and Hypothetical Questions to Vocational Experts**

■ The ALJ found that (1) Grant suffered from "severe impairments" which included "multiple cerebellar infarcts ... *and depression* " and (2) Grant could not return to his past relevant work as a result. (Tr. 29 (emphasis added).) · Thus, the ALJ was forced to reach step–5 of the sequential analysis. At that point the burden shifted to the government to show that a substantial number of jobs in the national economy existed for Grant in light of his disabling condition. *See, e.g., Morse v. Shalala,* 32 F.3d 1228, 1229 n. 2 (8th Cir.1994) (citing *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991)).

In order to satisfy this burden of proof, the ALJ was entitled to rely upon the testimony of a vocational expert ·that Grant was capable of performing jobs that existed in the national economy in significant numbers *if* the ALJ first asked that vocational expert to consider the impairments suffered by Grant that were substantially supported by the record as a whole. *See, e.g., Cruze v. Chater,* 85 F.3d 1320, 1323 & 1326 (8th Cir.1996). In other words, if the vocational expert testified that the claimant could find and perform substantial gainful activity even though the claimant had an impairment, the claimant could be denied benefits. The ALJ was not free, however, to ignore disabilities that were substantially supported by the record as a whole when putting hypothetical questions to a vocational expert. *See, e.g., Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision.)

**Treating Physicians**

■ "A treating physician's opinion is generally entitled to·substantial weight; however, such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical or diagnostic data." *Davis v. Shalala,* 31 F.3d 753, 756 (8th Cir.1994) (citing *Matthews v. Bowen,* 879 F.2d 422, 424 (8th Cir.1989)). Put another way, "an ALJ's dismissal of medical evaluations must be supported by substantial evidence." *Robertson v. Sullivan,* 925 F.2d 1124, 1126 (8th Cir.1991).

**B. Application of Law to Facts**

The ALJ's decision to ignore Grant's depression was apparently based upon two separate findings. Initially, the ALJ did not think that Grant's disability met the one-year durational requirement. Furthermore, the ALJ believed the depression was not sufficiently severe to preclude light work.

In both respects, the ALJ's decision is not supported by substantial evidence in the record as a whole. My reasons for this conclusion are set forth below.

1.

■ The ALJ did not believe that Grant's depression satisfied the durational requirement. (Tr. 25.) The ALJ failed, however, to explain why he came to this conclusion. (*Id.*)

The evidence is undisputed that on July 5, 1995, Dr. Himes, a treating neurologist, believed that Grant's disability, including depression, would extend at least one additional year into the future and that the depression had started no later than April of 1995. (Tr. 315–18.) Himes gave the following prognosis: "while he is making progress, it is not reasonable to expect that he is going to be able to find substantial gainful employment for at least another 12 months." (Tr. 318.)

Himes based his opinion not only upon his own examination of Grant, but also upon Dr. Brandon's findings after two days of extensive testing. Dr. Brandon also concluded that "given that [Grant] is now approximating two years post-CVA, [his] speed of recovery at this time may be expected to be slower." (Tr. 313.) It is also noteworthy that Himes relied upon a February 28, 1995, letter written by Dr. Emslie–Smith, the consulting neurologist at the Mayo Clinic. (Tr. 316.) She wrote that Grant's symptoms remained "disabling and at this length of time, the chances of improvement are unpredictable." (Tr. 298.)

Furthermore, it is undisputed that Grant's depression was the product of an "[o]rganic mood disorder" flowing from the strokes.

(Tr. 313.) "It has been observed that 25%–40% of individuals with certain neurological conditions ... including ... stroke ... will develop *a marked depressive disturbance*" and this type of disturbance is *"persistent."* *Diagnostic and Statistical Manual of Mental Disorders* § 293.83, at 368–69 (American Psychiatric Association, 4th ed. 1994) (DSM–IV) (Mood Disorders Due to a General Medical Condition) (emphasis added). As a result of the organic nature of the depression, there was no reason for the ALJ to believe that it would be brief.

In summary, there is no support in the record for ignoring Dr. Himes' finding that Grant's disability, which included a significant component of depression, would extend at least 12 continuous months into the future. Therefore, the ALJ could not discount depression for failure to meet the one-year durational requirement.

### 2.

■ The ALJ's evaluation of the severity of the depression is also difficult to follow. Apparently, the ALJ relied upon Dr. Brandon's evaluation to conclude that while Grant suffered from depression, there is "no indication that claimant would be unable to perform noncomplex routine and repetitive tasks." (Tr. 24.) The ALJ also stated that: "This capacity for routine and repetitive tasks is consistent with claimant's current employment cutting grass." (*Id* .) However, the ALJ's conclusion is inconsistent, it is based upon a misreading of Dr. Brandon's opinions, and it is built upon the false assumption that if Grant could mow lawns part-time, then it was proper to ignore the symptoms of depression for vocational purposes.

Initially, the ALJ found that Grant suffered from "severe impairments" which included "depression." (Tr. 29.) According to the Commissioner, a "severe impairment" is one that "significantly limit[s] your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521 (1998) (defining impairments that are not severe). It is therefore inconsistent for the ALJ to state that Grant suffered the "severe impairment" of "depression" (Tr. 29), while also concluding, in effect,

that Grant was employable in the "competitive and stressful conditions in which real people work in the real world." *McCoy,* 683 F.2d at 1147.

Next, Dr. Brandon made it clear that Grant should not work at menial jobs because such work would increase his depressive symptoms. (Tr. 338.)[5] In fact, in order for Grant to reach maximum recovery, Dr. Brandon specifically recommended that Grant apply for disability benefits rather than perform work that would increase the depression. (*Id.*) Hence, the ALJ misreads Dr. Brandon's opinions when he suggests that the evaluation supported the ALJ's conclusion that Grant could do light or sedentary work.

Finally, because Grant mowed lawns part-time, the ALJ erroneously ignored the undisputed evidence in the record that Grant suffered definite symptoms of depression. It does not follow that if a clinically depressed person mows lawns part-time while receiving special accommodations from his employer, that the acknowledged depression is irrelevant from a vocational point of view.

Dr. Himes, the treating neurologist, stated that Grant suffered from such signs of depression as difficulty talking when under stress and difficulties with concentration. (Tr. 303.) Dr. Brandon, the clinical psychologist, stated that Grant suffered anxiety, agitation, and mood swings. (Tr. 312–13.) Dr. Sorrell, the psychiatrist, stated that Grant suffered from anxiety, difficulty with concentration, lack of emotional control (crying) and poor sleep. (Tr. 339.) Mrs. Grant, herself a trained school psychologist, confirmed that she witnessed these symptoms in her husband while he was mowing lawns. (Tr. 328–29; 331–32.)

None of the doctors suggested that Grant's part-time job mowing lawns could be construed to mean that Grant's symptoms of depression were insignificant or that the depressive symptoms disappeared because he mowed lawns. Indeed, the import of the medical testimony is clearly to the contrary. Consequently, the record as a whole will not support the ALJ's conclusion that because

---

**5.** Dr. Sorrel, the psychiatrist, also came to this conclusion. (Tr. 339.)

Grant mowed lawns on a part-time basis, his depressive symptoms could be ignored for vocational purposes. While the ALJ was entitled to have the vocational expert fully consider Grant's mowing work, at the same time the ALJ was not entitled to have the expert ignore Grant's undisputed symptoms of organic mood disorder and depression. *See, e.g., Titus,* 133 F.3d at 564 (in part holding that where claimant's past jobs were menial and part-time, the jobs were no reason to reject expert's conclusion that claimant could not work in competitive environment).

### III. Conclusion

This case must be remanded to the Commissioner so that the ALJ can put proper hypothetical questions to a vocational expert. While the ALJ and the vocational expert may consider Grant's part-time job mowing lawns, the ALJ and the vocational expert must also consider the symptoms of Grant's organic mood disorder and depression.[6]

IT IS ORDERED that judgment will be entered by separate document for the plaintiff and against the defendant reversing the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) (sentence four) and remanding this case for further proceedings consistent with the opinion of the court.

6. Grant argues that I should simply award benefits, but I will not do so. The decision to award benefits is not a foregone conclusion. Moreover, Grant argues that I should order that the case be referred to a new ALJ. I refuse to do so because, among other reasons, there is not the slightest reason to conclude that the ALJ is biased against Grant. Finally, Grant argues that jobs such as a cafeteria monitor do not amount to substantial gainful activity. This is a question that should be first put to the ALJ and the vocational expert. Moreover, the record is presently insufficient to address the question intelligently. Because the case will be remanded and the remand will provide an opportunity to build an adequate record, I decline to address the substantial gainful activity argument.